EUGENIA WILLIAMS CHANDLER, COMPLAINANT, APPELLANT, v. JAMES PATRICK RODDY et al., DEFENDANTS, APPEL-LEES.

(*Knoxville*, September Term, 1931.)

Opinion filed November 14, 1931.

Frantz, McConnell & Seymour and Testerman & Burnett, for complainant, appellant.

Johnson & Cox, Jas. B. Wright, Mitchell Long, Hamilton & Hamilton and Edmond Brody, for defendants, appellees.

Mr. Chief Justice Green delivered the opinion of the Court.

This is a suit by Eugenia Williams Chandler, daughter of the late D. H. Williams, to establish her right and title to certain personal property acquired by her father

during his lifetime. She claims that, prior to his death, he gave said property to her. D. H. Williams left a will, under which his daughter was to act in a trust capacity hereinafter appearing. She files the bill, therefore, in an individual capacity to set up her own rights and likewise as a trustee for a declaration as to the rights of all parties involved. The executor of the will and certain contingent remaindermen were made parties defendant and they answered denying that there had been any completed gift of the property involved to Mrs. Chandler and insist that said property passed under the will. There was a mass of proof taken and the chancellor found that there had been no gift to the daughter, except as to some $68,000 of bonds and her claim to these bonds is no longer in dispute. The State of Tennessee filed an intervening petition in the cause seeking to collect a further inheritance tax and the relief prayed in this petition was in the main granted by the chancellor.

Mrs. Chandler appealed from so much of the chancellor's decree as was adverse to her in the main case, and all parties were dissatisfied with the chancellor's ruling upon the State's intervention and seek a review of the decree below in that aspect.

In 1920 D. H. Williams made a will by which, after certain particular provisions, generally speaking, he left his estate to a trustee, the income to be paid to his daughter until she was thirty years of age. Upon reaching that age, the property was to be turned over to her for life with remainder to her issue. If she died without issue, one-half was to go to the National Geographic Society and one-half to James P. Roddy and Roddy's family. Roddy was an intimate friend and business associate of the testator and was named as executor under

342

the will and designated as trustee until the daughter reached the age of·thirty years.

Mrs. Chandler became thirty years of age shortly after her father's death. Roddy meanwhile had qualified as executor, paid off the legacies provided in the will, paid the debts and thereupon turned the entire estate over to Mrs. Chandler, with the exception of some $25,000, which it was agreed he was to hold to cover any further liability that might be adjudged against him as executor for inheritance taxes, etc. The daughter therefore has all the property in litigation in her possession and the question is whether she holds it in her own right as a gift from her father, or as life ·tenant and trustee under her father's will.

That part of the Williams estate which the daughter claims as a gift consists of certificates of deposit, stocks and bank deposits valued at more than $600,000.

There has been a great deal of discussion in the briefs and at the bar as to the admissibility of testimony of Mrs. Chandler in which she undertook to detail transactions and repeat conversations had with her father whereby it is contended he gave to her the money and securities in dispute. All this evidence was excepted to by the defendants and the chancellor sustained these exceptions. His Honor was of opinion that section 5598, Thompson's-Shannon's Code, providing that in actions by or against executors, etc., neither ·party should be allowed to testify against the other as to any transaction with or statement by the testator, etc., applied. It is insisted for the complainant that the executor is merely a nominal party to this suit; that he had turned the property over to Mrs. Chandler as trustee, and had no further interest therein; and that the statute was not applicable.

We do not find it necessary to pass on this controversy. All the material features of the excluded evidence of Mrs. Chandler are covered by the testimony of other witnesses without interest in the subject of litigation. Mrs. Chandler merely goes into somewhat greater detail than the other witnesses. If her excluded testimony be considered, therefore, it adds nothing to her case. If it be rejected, her case is not thereby weakened. Her account of her father's dealings with her and his declarations to her is confirmed by the proof of her husband, Mrs. Cornick, Bacon, Briscoe, Jenkins, Weems, Roddy himself, and perhaps other witnesses.

Mrs. Chandler's story is that in 1920, prior to her marriage, her father called her into his office where there was a small iron safe belonging to him. He taught her the combination of the safe. He showed her the contents of the safe, including various certificates of deposit, shares of stock, and the like. These securities were contained in envelopes and testator had endorsed these envelopes as containing the property or personal property of Eugenia Williams. She said that he told her that he had given her all these securities; that they were all hers.

Sometime later Mrs. Chandler testifies that she was in her father's office and he asked her if she remembered the combination of the safe. She had forgotten it and he taught it to her again and again made these declarations as to his having given her the contents of that safe.

Later in the year 1920 the daughter married. It seems that her father objected to her marriage and there was somewhat of an estrangement between father and daughter for a time. Within two years, however, the affectionate relations between them were restored and

Mrs. Chandler and her husband went to her father's house to live with him. He was a widower with only this one child, having lost his wife and other children some years before. Likewise the relations between the father and the son-in-law seem to have become quite cordial and to have remained so until the father's death.

About the year 1926, the testator, assisted by his son-in-law, Chandler, removed the securities mentioned from the iron safe in testator's office to a safety deposit box in the City National Bank. Chandler testifies with respect to the details of this move and to statements by testator at the time that he had given all this property to his daughter—that it was her's. Chandler likewise testifies as to the securities being enclosed in envelopes which testator had endorsed as containing the property of Eugenia Williams Chandler, the name Chandler appearing to have been added in most cases to the original endorsements.

At this point we should note a contention made for complainant that there was a manual delivery of the securities here by her father to her husband as her agent. We think, however, that there was no intention by the testator to change title by any delivery made on this occasion. The stocks, etc., handed to Chandler at this time were handed to him for the purpose of having him assist in the transportation of this property to the City National Bank.

The box at the City National Bank was rented by D. H. Williams. A key or perhaps two keys were given by the bank to Williams. The contents of the iron safe were placed in the box. Williams alone had access to the box. So matters stood for perhaps two years.

The various certificates of stock, certificates of deposit, and bank books contained in this box were all issued

to D. H. Williams. All these securities stood in his name. None of these securities were endorsed by him except a certificate for 732 shares in the Charles H. Bacon Company which will be referred to hereafter.

It appears that it was the custom of D. H. Williams to spend his winters in Florida. In 1928, shortly before he left, he gave necessary directions at the bank to authorize Mrs. Chandler to enter this safety deposit box. Under the bank regulations only such persons might enter the boxes as were recorded on the bank's books as having such right of entry. At this time Mrs. Chandler went to the bank and signed the card or papers required as an incident to joint control of the box. At this time it seems, however, that there was only one key to the box and when Williams went to Florida he took that key with him. It is fair, however, to say that Mrs. Chandler insisted that he should take the key with him, explaining that she did not want the responsibility of the custody of the key.

Mrs. Chandler testifies that when the arrangement was made which gave her joint access to the box at the City National Bank, her father reiterated his statements that all the contents of the box belonged to her, said she was old enough to assume some responsibility, and he wanted her to have a right of entry into the box.

As heretofore stated, Mrs. Chandler's testimony is corroborated in its essentials by several disinterested witnesses. There seems to be no doubt but that D. H. Williams repeatedly declared that he had given all the property here in controversy to his daughter. We think the clear preponderance of proof is that Williams endorsed the envelopes containing the securities involved as the property or personal property of his daughter and

that these securities were found in these envelopes in the bank box after his death. Likewise the testimony of the bank officials shows that Williams authorized her entry into this box in 1928. Williams died October 1, 1929.

The question here is whether there had been any such delivery of the property by the father to the daughter as to complete a gift to her. A surrender of dominion and control by the donor is, of course, essential to a gift. The father here retained possession of the property until his death but the argument of counsel for the daughter is that his possession was as her agent.

In opposition to the idea that D. H. Williams completed a gift of this property to his daughter are many circumstances. He continued to pay taxes on all such property as his own and figured the returns therefrom in making his statements for his own income tax. He collected the dividends on all these stocks. The interest on the bank deposits was permitted to accumulate until his death. The argument for Mrs. Chandler is that her father was collecting the income from the property and reinvesting it for her. There is, however, no detailed showing as to how he disbursed the income from said property. He seems to have had a salary of $300 a month from the Roddy Manufacturing Company and it is urged that he lived within this salary but there is evidence to the contrary. It appears on the record that he invested $25,000 in a newspaper enterprise at Knoxville, which failed, and naturally no man of business sense and integrity such as Williams would hazard a trust fund on such speculation.

There were new issues of stock in several of the corporations in which Williams had bought shares, stock

dividends, and the like, and Williams took these new issues in his own name after the gift to his daughter is alleged to have been made.

Previous to his last trip to Florida, Williams gave to his son-in-law, Chandler, a power of attorney authorizing him to attend to matters in connection with certain bank stock in the safety deposit box. This power of attorney treated of the bank stock and other stock as Williams' own, not his daughter's. Upon certain other shares of stock Williams had given an option. It was likely that this option would be exercised during his absence. Before he left, Williams got these shares out of the box and put them into the possession of his son-in-law.

As a matter of fact, it appears that no one ever did enter the safety deposit box of Williams' at the City National Bank until after his death.

The will of D. H. Williams was drawn by Mr. L. H. Spilman, of the Knoxville bar, in 1920. Mr. Spilman testified that Williams was very clear and definite as to the disposition that he desired should be made of his property and that the drafting of the will was attended with little difficulty. This will was preserved by Williams until his death, in the safety deposit box, which he alone entered. In the will was a bequest of $5,000 to Mrs. Cornick and a bequest of $10,000 outright to the National Geographic Society. His home place was given to Mrs. Chandler by the will. His other real estate amounted to little. If he had given all the personalty to Mrs. Chandler, as she maintains, there would not have been enough to pay the two bequests of $5,000 and $10,-000. Why should the will have been preserved under such circumstances?

Every witness who testifies for the complainant with reference to the declarations of her father as to the gift

of his property to her brings it out that D. H. Williams had a great desire to have his estate escape an inheritance tax. He seems to have talked about this to all of these gentlemen and to have expressed the opinion that he had things arranged so that the inheritance tax would not reach his property. These declarations of a gift to his daughter, the writing of her name on the envelopes containing his securities, and his directions at the bank that she be given access to his box, while he took off the only key, may be ascribed to his disposition to defeat the inheritance tax quite as much as they may be ascribed to his disposition to surrender dominion and control over his estate.

Counsel for the complainant have observed that the intention of the alleged donor is the determinative factor upon the question of a gift. D. H. Williams had no difficulty in making his intention clear when he wished to complete a gift of securities to his daughter. There were 34 shares of stock in the Roddy Manufacturing Company originally belonging to his deceased wife. It does not appear that she made a will. Upon her death and the death of a minor son, he (Williams) had a certificate for these shares of stock issued to Mrs. Chandler and that certificate was delivered to her. Williams had some $68,000 of bonds which he gave to his daughter. These were carried for a time in Mrs. Chandler's name in a bond account in the City National Bank. Later the bonds were taken out of that account and manually turned over to Mrs. Chandler. She had a separate safety deposit box at the City National Bank. The 34 shares of Roddy Manufacturing Company stock and these bonds amounting to $68,000 were put in her private box. We can see no reason why Williams should not have dealt with all the securities as he dealt with the bonds and

the 34 shares aforesaid, if indeed it was his intention to part with his ownership of all the securities and his dominion and control over the same. Why, indeed, should the so-called joint box have been retained by him at all?

After a full consideration of the proof, we are forced to agree with the chancellor that there was no perfected gift of the contents of the box of D. H. Williams to his daughter—no delivery. Undertaking to quote the language of her father before his trip to Florida and after he arranged for her to have access to his safety deposit box at the bank, Mrs. Chandler ascribes to him this language: "Eugenia, remember everything in the box belongs to you. If anything happens to me you go and get those things."

We have no doubt but that D. H. Williams so expressed himself and that this expression evinced his intention. Not that Mrs. Chandler might go and get *those things* at her pleasure, but that she might go and get *those things* if anything happened to him. Such permission was of course not a transfer of a present interest and hence not equivalent to a gift *inter vivos*.

Referring to the principles announced in previous decisions of this court, we are satisfied there was no tradition of the securities in litigation with the exception of the 732 shares of stock in the Charles H. Bacon Company.

██ "The effect of a valid delivery is to place the subject of the gift under the control and dominion of the donee, and his title and right to possession become irrevocable." *McEwen* v. *Troost*, 33 Tenn. (1 Sneed), 186.

The foregoing is repeated in *Trowel* v. *Caraway*, 50 Tenn. (10 Heisk.), 104.

██ "If the intention to give or to declare the trust be not clearly made out, it cannot be sufficient; and if upon

the facts, the matter be enveloped in doubt, that doubt must prevail against the hypothesis of gift—and this is especially so where creditors are to be obstructed, embarrassed or postponed in the collection of their debts.'' *Sheegog* v. *Perkins,* 63 Tenn. (4 Baxt.), 273.

"An absolute gift, which will divest the donor's title, requires a complete renunciation on his part, an acquisition on the part of the donee of all title to and interest in the subject of the gift.'' *Marshall* v. *Russell,* 93 Tenn., 261.

*Balling* v. *Trust Co.,* 110 Tenn., 288, repeats the rule quoted from *Sheegog* v. *Perkins, supra,* that, if there is a doubt about the matter, that doubt must be resolved against the hypothesis of gift, and applies this rule in a case where no creditors were involved.

In *Shugart* v. *Shugart,* 111 Tenn., 179, the previous cases are referred to and it was held that the delivery to the donee of a certificate of deposit issued in the donor's name did not of itself complete á gift if the donor thereafter repossessed himself of the certificate of deposit and used its proceeds.

In *Atchley* v. *Rimmer,* 148 Tenn., 303, it was held that a gift might not be established by proof of declarations of the donor alone. The case illustrates the close scrutiny which the court will give to evidence by which it is sought to establish a gift after the donor's death.

In *Scott* v. *Bank,* 123 Tenn., 258, the court said that "where it is once ascertained that it is the intention of the donor to make such a gift and all is done which is possible under the circumstances in the matter of delivery, the gift will be sustained.'' A gift *causa mortis* was here under consideration but the rules with respect to the delivery of such a gift are the same as the rules with respect to the delivery of a gift *inter vivos.*

*Wilson* v. *Wilson*, 151 Tenn:, 486, follows the rule announced in *Scott* v. *Bank, supra,* with respect to delivery.

*Williams* v. *Thornton,* 160 Tenn., 229, applies the rule of the previous cases and holds that to complete a gift the intention of the owner to release the dominion and control of the subject must clearly appear.

*Royston* v. *McCulley,* 59 S. W., 775, 52 L. R. A., 899, is a case decided by the Court of Chancery Appeals, frequently referred to, and sustains a constructive delivery of notes which had been endorsed by the donor to the donee. The donor's subsequent possession was held to be as agent of the donee.

In *Trowel* v. *Caraway, supra, Wilson* v. *Wilson, supra,* and *Royston* v. *McCulley, supra,* where constructive deliveries were upheld, negotiable instruments were the things given, and these instruments had been endorsed by the donor to the donee. It was said in *Wilson* v. *Wilson* that no stronger evidence of an intention to give a negotiable instrument could be offered than proof of a *bona-fide* endorsement of such instrument by the donor to the donee.

In *Sheegog* v. *Perkins, supra,* a box of gold coin deposited in a Nashville bank was involved. There was evidence that the husband had given the key to this box to his wife. Other proof, however, indicated that he had used part of the gold himself after delivery of this key. Under such circumstances the court applied the rule of resolving the doubt against the gift.

In *Balling* v. *Trust Co., supra,* the owner of a savings bank book handed it to another, saying to that other person that he wanted her to have the money in case he did not return. It was ruled that since the donor had power, if he did return, to revoke the inchoate gift, there was no delivery.

■ Referring again to the ·732 shares of stock in the Charles H. Bacon Company, it appears that the certificate for such shares of stock was issued to D. H. Williams but had been endorsed by him specifically to the complainant. This certificate of stock was found in the safety deposit box of D. H. Williams endorsed as aforesaid.

It is obvious from the previous discussion that it was the custom of D. H. Williams to physically deliver to his daughter all the securities that he took out or dealt with in her name. There would seem to have been no point in his endorsement of the Bacon certificate aforesaid to Mrs. Chandler, unless it had been the fixed intention of her father to give her the shares of stock represented by this certificate. No other certificate of stock remaining in his box was dealt with in this way. Following *Wilson* v. *Wilson, supra,* and *Royston* v. *McCulley, supra,* we hold that the possession of this certificate of stock by Williams, subsequent to his endorsement thereof, was as agent for his daughter and that this gift was complete. Doubtless his failure to transfer manual possession to her of this certificate was an oversight.

### INTERVENTION OF THE STATE.

Shortly after the death of D. H. Williams, his executor, acting through counsel, made a settlement with the County Court Clerk of Knox County as to the inheritance tax due upon the estate. The county court clerk was paid $7,664.52, which amount appears to have been determined by that official as the sum due on this account.

On November 21, 1930, the State of Tennessee, upon relation of the Attorney-General and the Commissioner of Finance and Taxation, filed a petition herein seeking

to recover an additional sum which it was claimed was due on account of inheritance tax. An undervaluation of the estate was charged, it was said there had been no appraisement by the clerk of the county court, that the clerk made his calculations upon an improper basis and that certain property was omitted by the clerk in estimating the value of the estate. This petition was answered by the parties interested, some of its allegations of fact controverted, and the right of the State to maintain said petition otherwise denied. Some proof was taken and by his decree the chancellor adjudged that the total due on account of inheritance tax was $32,-360.36. He awarded a recovery for this sum, less a credit of $7,664.52 already paid as aforesaid.

The State's petition was filed prior to the decision of this court in *State, ex rel.* v. *American Trust Co.,* 161 Tenn., 570. We are unable to see how the petition can be maintained since that decision construing section 5 and section 14 of chapter 46 of the Acts of 1919. The second and third paragraphs of section 5 aforesaid are in these words:

"It shall be the duty of the executors, administrators and trustees to give information to the county court clerk of the county where the administration of said estate is being had, and of the county court clerk to demand and require of administrators, executors and trustees, itemized and detailed reports of all property of the particular estate of which he is the representative, including real property. The county court clerk aforesaid may examine the register's office and all other public records of the county, and he may take such other evidence as will enable him to arrive at a just and equitable determination of the amount of any such tax, and to that end

is authorized in the usual way, to enforce the attendance of witnesses, and the giving of evidence.

"Said county court clerk shall reduce his findings to writing and file the same, which shall have the force and effect of an order or judgment determining the amount of such tax. He shall at once forward to the comptroller of the treasury on such form as may be prescribed by said comptroller, a full report of his action in the premises, including a copy of his judgment, within ten days after rendering the same, and within the same time shall furnish to the administrator, executor or trustee, a duplicate copy which shall be sufficient notice to all persons beneficially interested in any certain estate. The action of the county court clerk in appraising the property and determining the tax aforesaid, in any case, shall be final unless within sixty days thereafter the executor, administrator or trustee, or any person beneficially interested in the estate, or the comptroller of the treasury, or any revenue agent of the State, as they may do, shall file exceptions thereto, which exceptions shall point out specifically the grounds of any objections to the same."

Section 14 of the Act confers upon the comptroller of the treasury authority to sue in the name of the State or intervene in any pending cause to enforce the collection of inheritance taxes under certain circumstances. In *State ex rel.* v. *American Trust Co., supra,* it was said that this section "clearly relates to a case where no appraisal has been made within a year, or if made the tax has not been paid within that period."

The court further said that a clear and specific procedure was pointed out in section 5 of the Act to parties dissatisfied with the finding of the county court clerk

with respect to the amount of inheritance tax due. In *State ex rel.* v. *American Trust Co.* the clerk made certain deductions which the commissioner of finance did not approve and the clerk was instructed to make another appraisement which he declined to do. The State took no exceptions to the findings of the county court clerk as provided in section 5, nor did the State attempt to review the action of the county court clerk by writ of *certiorari,* which writ it was suggested might under certain circumstances be employed. The tax having been paid upon the valuation, fixed by the county court clerk, and not excepted to, it was held that the State could not maintain a bill in chancery for an additional recovery on this account.

In the case before us it appears that the county court clerk, from his own testimony, did make an appraisement of the Williams estate. He testified that he changed the valuation of stocks as given him by the executor in two or three instances. He further testified that he did not know the value of the Roddy Manufacturing Company stock and of the Johnson City Coca Cola Company stock. In his inventory the executor listed other stocks at their market value. He listed the two stocks aforesaid at their par value, his inventory showing that he was giving in par value. It seems that the county court clerk, without any investigation, concluded that par value was the proper valuation to be put on these stocks. There is no showing of fraud on the part of the executor. It seems to be a case where the county court clerk was not so diligent as he should have been. He was given full authority by section 5 to make investigation as to the value of these stocks but did not exercise his authority.

■ Under such circumstances we think the State's petition must be dismissed upon the authority of *State ex rel.* v. *American Trust Co., supra.*

The State had sixty days in which to file exceptions to the findings of the county court clerk and did nothing. The action of the county court clerk was reported to the commissioner of finance and taxation in December, 1929, on a form provided by the latter official for that purpose, and no action was taken by the State until nearly a year afterwards when this intervening petition was filed.

Among other things, section 5 provides that "said county court clerk shall reduce his findings to writing and file same, which shall have the force and effect of an order or judgment determining the amount of such tax." Such finding was written out and filed by the clerk and the same is sent up as an exhibit with this transcript. The petition here seems to be a collateral attack on the judgment of the county court clerk with no such showing as is necessary to maintain such an attack.

It is said by the State that this estoppel is not sufficiently pleaded by the defendants to the petition. The facts, however, constituting the estoppel appear on the face of the petition.

It is said in the petition, among other things, that after the inventory had been filed "negotiations were instituted with the County Court Clerk of Knox County with a view to the payment of an inheritance tax owing to the State of Tennessee upon the transfer of said properties under the will aforesaid, and as provided by the statutes of Tennessee." And that the county court clerk "treated said inventory aforesaid and the par value of the shares therein set out as reflecting the actual value of said shares, and upon the mistaken theory that said amounts

stated as the par value of said shares represented the actual value thereof, proceeded to adopt said inventory figures as the value of the properties therein listed for the purpose of computing an inheritance tax assessment."

To say that figures were adopted as the value of properties for the purpose of computing an inheritance tax assessment is but to say that there was an appraisal of properties for purposes of computing an inheritance tax assessment. That there was an appraisal thus appears from the petition itself. It is not necessary to plead an estoppel *eo nomine*. If the facts constituting an estoppel appear in some pleading, that is sufficient to permit the defense. *Boone* v. *Citizens Bank & Trust Co.*, 154 Tenn., 241; *Maryland Casualty Co.* v. *McTyier*, 150 Tenn., 691.

The sum of the intervening petition is that the county court clerk made an erroneous determination of the amount of inheritance tax due from this estate. The proof does not show any fraud or fraudulent concealment on the part of the executor. He only undertook to show par value of some stocks. If his inventory was not as complete as the clerk desired, that official was empowered to call on the executor for further information.

It results that the intervening petition of the State must be dismissed.

The decree of the chancellor will be modified as respects the 732 shares in the Charles H. Bacon Company and otherwise affirmed. The costs of the cause will be taxed to the estate of D. H. Williams. Remand for further proceedings.