# BLACK v. LOVE & AMOS COAL CO.
## —206 S. W. (2d) 432.

Middle Section.   April 26, 1947.

Rehearing denied June 28, 1947.

Petition for Certiorari denied by Supreme Court, December 12, 1947.

378

Norman Farrell and Jack Keefe, both of Nashville, for complainant.

Albert Williams, Joe Brown Cummings, and Kenneth Harwell, all of Nashville, for defendant.

FELTS, J. Mrs. Black, doing business as Black Coal Company, brought this suit to recover for breach of three

contracts by which Love & Amos Coal Company agreed to sell and deliver to the Black Coal Company a total of 143 cars of coal, a stated number of cars to be delivered each month from August 1942 to March 1943, the price to be the "market price when shipped." Her bill averred that defendant failed to deliver 122 cars of the coal, that in the course of her retail business she could have sold this coal for a profit of $9,150, and that she was entitled to that amount as damages.

Answer was filed and proof taken by depositions. The Chancellor heard the cause, found defendant had breached the contracts, and ordered a reference to the Master to report the amount of complainant's damages. Further proof by depositions was adduced, and the Master reported that defendant failed to deliver 122 cars of the coal, about 6,100 tons; that complainant could have sold this 6,100 tons for a profit of $0.33 per ton, or $2,013; and that she was entitled to that amount of damages.

Both parties excepted to the Master's report, complainant insisting he should have fixed her damages at $9,882, or at a profit of $1.62 per ton on the 6,100 tons; defendant insisting he should have reported only nominal damages. The Chancellor overruled all the exceptions, confirmed the Master's report, and decreed complainant a recovery of $2,013 and costs.

Both parties appealed and have assigned errors. Complainant contends that the concurrent finding by the Master and the Chancellor of the amount of her damages is not binding on us and that we should find such amount to be $9,882.00—lost pofits of $1.62 a ton on the 6,100 tons not delivered. Defendant insists this concurrence is binding but, if not, the proof justifies no more than nominal damages.

■ A concurrence of the Master and the Chancellor is conclusive on appeal (Code, sec. 10620) except (1) where it is upon an issue not proper to be referred (State ex rel. v. Bolt, 130 Tenn. 212, 169 S. W. 761); (2) where it is based on an error of law (Hord v. Holston River Railroad, 122 Tenn. 399, 123 S. W. 637, 19 Ann. Cas. 331, 135 Am. St. Rep. 878); (3) where it is upon a question of law or mixed fact and law (Dale v. Hartman, 157 Tenn. 60, 6 S. W. (2d) 319); or (4) where it is not supported by any material evidence (Code, sec. 10620).

Such a concurrence is conclusive not only as to the credibility of the witnesses and the basic evidentiary facts but also as to the reasonable inferences drawn from such facts. It has the same force and effect as a verdict of a jury approved by the trial judge. Conaway v. New York Life Ins. Co., 171 Tenn. 290, 293-295, 102 S. W. (2d) 66, 67-68; Gibson's Suits in Chancery, 4th Ed., section 620, and cases there cited.

For complainant it is urged that this concurrence is not conclusive because it was not proper to refer to the Master the question of the amount of her damages. The argument is that defendant admitted its breach of the contracts; that the primary and the only issue was the amount of her damages; and that under State ex rel. v. Bolt, supra, this issue should have been determined by the Chancellor without a reference.

In that case the only issue made by the answer was whether the execution had come into the sheriff's hands. It was held that this issue should not have been referred to the Master. The Court approved the statement of Gibson to the effect that the line between what may, and what may not, be referred is not well defined; but that generally the main issues must be determined by the

Chancellor, while collateral, subordinate, and incidental issues and the ascertainment of facts ancillary to the main issues may be referred to the Master. Gibson's Suits in Chancery, section 596.

This work states that it is proper to refer to the Master "the assessment of damages in any case where properly allowable" (sec. 595, (14)—"what amount of damages is properly allowable in a given case" (sec. 598, (6); and such has long been the practice.

In the case before us defendant's answer denied it had breached the contracts, and the main issues upon the pleadings were as to defendant's breach and complainant's right to recover. Both parties took a large amount of proof on these issues. While it is said defendant admitted its breach in its proof, we do not find such admission. Its witness Amos admitted it had not delivered 122 cars of the coal but did not admit this constituted a breach of the contracts. Complainant claimed it did, and undertook to prove her past profits in her coal business as the basis for recovery of prospective profits on the coal not delivered. This necessarily involved an accounting as to the whole of her coal business for the years 1942 and 1943.

The Chancellor determined the main issues of defendant's breach and complainant's right to recover damages, and referred to the Master the subordinate question of the amount of them. That was a pure question of fact—the amount of actual loss in dollars and cents caused complainant by defendant's breach. That amount, she claimed, was her expected profits as shown by her past profits. To establish such profits and thereby the amount of her damages required a complicated and extended accounting, and a reference to the Master was

not only proper but mandatory. Provident Life & Accident Ins. Co. v. Globe Ind. Co., 156 Tenn. 571, 3 S. W. (2d) 1057.

Complainant further contends this concurrence is not conclusive of the amount of her damages because it is based on an error of law (citing Hord v. Holston River Railroad, supra) and is not supported by any material evidence; that the uncontradicted proof shows she would have made a profit of $1.62 a ton on the 6,100 tons not delivered, or $9,882; and that her damages should be fixed at that amount. As stated, defendant's insistence is that, if the question is now open, the proof is insufficient to support complainant's claim to recover lost profits, or to warrant recovery of any but nominal damages.

█ █ The law of damages aims at compensation for the actual loss sustained, but within these limits: In tort liability arises in invitum, by force of law; and the extent of liability is fixed by law independently of the wrongdoer's consent. The law holds him not for all the harm that follows his wrong, not for all its consequences, but only for its proximate consequences. In contract liability arises from one's own voluntary undertaking, and the extent of his liability is measured by the contract—"the parties themselves, expressly or by implication, fix the rule by which the damages are to be measured." Holmes, in Globe Refining Co. v. Landa Cotton Oil Co., 190 U. S. 540, 543, 23 S. Ct. 754, 47 L. Ed. 1171, 1173; cf: Czarnikow-Rionda Co. v. Federal Sugar Ref. Co., 255 N. Y. 33, 173 N E. 913, 88 A. L. R. 1426, 1432; 5 Williston on Contracts( Rev. Ed.), sec. 1357.

█ Ordinarily, the only loss the buyer sustains from the seller's non-delivery of the goods is the difference between the contract price and the market price of the

goods, because he can replace them by buying in the market. " 'The proper measure of damages in general is the difference between the contract price and the market price of such goods at the time when, and place where, the contract is broken, because the purchaser having the money in his hands may go into the market and buy.' " 5 Williston on Contracts, Rev. Ed., sec. 1383; Tennessee Fertilizer Co. v. International Agricultural Corporation, 146 Tenn. 451, 463-464, 243 S. W. 81.

In cases, however, where there is no available market or where there are other special circumstances enhancing his loss, the buyer may recover such damages as naturally arise, according to the usual course of things, from the seller's breach, or such as may reasonably be supposed to have been contemplated by the parties, at the time of making the contract, as the probable result of its breach. Code section 7260; Chisholm & Moore Mfg. Co. v. United States Canopy Co., 111 Tenn. 202, 77 S. W. 1062; Hagan v. Nashville Trust Co., 124 Tenn. 93, 136 S. W. 993.

The question whether expected profits are recoverable as damages for breach of contract has been a controversial one in law. The earlier tendency was generally to regard such profits as remote or as speculative or as not a part of the contract. Hagan v. Nashville Trust Co., 124 Tenn. 93, 98-100, 136 S. W. 993. But the modern view is that such profits may be recovered where they were part of the contract—where an engagement to pay them can be found in the terms of the contract or implied from the circumstances in the light of which it was made —and where they are not in fact remote or speculative but are proved to a reasonable certainty. Hagan v. Nashville Trust Co., supra; Chisholm & Moore Mfg. Co. v.

United States Canopy Co., supra; 5 Williston on Contracts, Rev. Ed., secs. 1345-1346A; Rest., Contracts, sec. 331; Notes, 17 Minn. L. Rev. 194, 46 Harv. L. Rev. 696.

Each of these contracts was made July 28, 1942, and each was the same except the kinds and quantities of coal. In each the contract price was the ''market price when shipped.'' This alone would indicate that the parties contemplated there would be an available market by which to fix the contract price, and that they did not contemplate the special circumstances on which complainant's claim is based, viz.: That she could not buy other coal in place of that not delivered, because there was no available market, and therefore she lost the profits she would have made by selling this coal in the course of her business.

But we must look also to the other parts of the contract and to the circumstances under which it was made. Our country was then at war; there was a shortage of coal; and the coal industry was controlled by the Government. The contract provided that the price should be the market price when shipped but in no event less than the minimum price fixed by the Department of Interior. The contract also contained a number of other provisions subjecting it to regulations of the Department.

Mrs. Black first said she could not buy any more coal. But later, in attempting to explain discrepancies in her records, she said she had bought other coal in the market. There was other proof that she had bought some 40 cars of like coal in the market. But no one denied that the demand was much greater than the supply of coal. The evidence was in conflict as to whether there was an available market in which she could purchase enough to replace the coal not delivered. So there was material

evidence to support the concurrent finding that she could not do that.

■ In view of these circumstances, we think the parties must be held to have contemplated, at the time of making the contracts, that there might not be an available market and that defendant's non-delivery of the coal, or any part of it, might cause complainant to lose such profits as she might make by selling this coal in the ordinary course of her business. This was the ground of the reference, and we think the concurrence was not based on any error of law.

This record is large and the evidence voluminous. Mrs. Black and her husband gave their depositions two or three times. Each party took the depositions of a number of other witnesses. Numerous books and records and papers were filed as exhibits and are sent up. Each party called an expert accountant to study the books and records and to testify what they showed and the results of the accounting.

■ Upon full consideration we think there is material evidence to support the concurrent finding of the Master and the Chancellor as to the amount of loss caused complainant by defendant's breach and the amount of damages she is entitled to recover.

Mrs. Black first undertook to prove her loss of expected profits upon the basis of her actual past profits. She testified she had made an average net profit of $1.50 per ton on the 28,500 tons of coal sold by her during the two years of 1942 and 1943. She said she had made an average gross profit of $2.11 per ton and her cost of doing business was $0.61 per ton. In another place (Ex. 7, Tr. 27) she said such cost was $0.70 per ton in 1942

and $0.89 per ton in 1943, or about $0.79 per ton for the two years (see Tr. p. 311).

Later, on cross examination, she was asked to produce the books and records of her business for these two years. She said some of her books had been burned up; she produced some others, but none of them threw any light upon the case except her purchase journal; and it, she said herself, was incomplete and inaccurate to the extent of $14,000. The only complete and reliable records she produced were copies of the joint income tax returns of her and her husband for 1942 and 1943, with the attached profit and loss statements of her coal business for these years.

These records contradicted the testimony of her and her husband as to her profits. They showed she had made no profit in 1942 or in 1943, but had operated at a loss both years. In 1942 her gross profit per ton was $0.86, her cost $0.99, and her loss $0.13 per ton. In 1943 her gross profit per ton was $1.08, her cost $1.24, and her loss $0.16 per ton (Exs. 4, 5, Tr. p. 153).

Then Mrs. Black proposed a new theory of her lost profits. It was based on the difference between the average price of the coal (plus freight and $0.6046 a ton as cost of doing business) and the average of the ceiling prices filed by her with the O. P. A. She employed an expert, gave him the data, and he submitted a statement (Tr. p. 275) to show that her profits on the 6,100 tons not delivered would have averaged $1.62 per ton, or $9,889.44.

This theory, as we have seen, was rejected by the Master and the Chancellor. The Master found complainant had made an average gross profit of $0.94 per ton on the 28,500 tons sold by her in 1942 and 1943. He

counted her cost of doing business at $0.61 per ton. This left a net profit of $0.33 per ton. He fixed her loss of profits on the 6,100 tons not delivered at this amount. He could as well have accepted her statement of her cost of $0.79 per ton and fixed her loss at $0.15 per ton (see Chancellor's opinion, Tr. p. 311), or accepted her showing in her income tax returns and found she had made no profits on the coal sold and had probably lost none on the coal not delivered. But these conflicts in the evidence were matters to be resolved by the triers of fact, the Master and the Chancellor.

This last theory is pressed before us, as it was before the Master and the Chancellor. It is unacceptable, we think, for several reasons. At most it would merely show a paper loss of profits. Recovery must be based not on a paper but an actual loss. This theory rests on assumption and speculation, without any reliable basis in fact. It assumes that the prices for the 6,100 tons not delivered would have been the same as the prices of the quantities delivered; it also assumes Mrs. Black would have realized as profits the difference between those prices (plus freight and $0.6046 cost) and her ceiling prices. The ceiling prices relied on were those effective February 28, 1943. What her ceiling prices were before that date, or what they were after that date, does not appear.

Moreover, there was proof by two other coal dealers that she sold for less than the ceiling prices. The basic data of this theory depends upon the credibility of Mr. and Mrs. Black. They were interested witnesses and involved in contradictions. Their credibility was a matter for the Master and the Chancellor. Poole v. First Nat. Bank of Smyrna, Tenn. App., 196 S. W. (2d) 563. It was for the Master and the Chancellor to

choose between the conflicting versions and to say what parts of the testimony of Mrs. Black and her husband were to be believed, and what parts rejected.

This concurrent finding, being supported by material evidence, is conclusive on us, and we have no power to disturb it. The decree of the Chancellor is affirmed. The costs of the appeal are adjudged against Mrs. Black and the sureties on her appeal bond.

Howell and Hickerson, JJ., concur.

On Petition for a Rehearing.

FELTS, J. Mrs. Black has filed a petition to rehear. It is but a reargument of one of the four theories possible upon her proof for the accounting—the theory most favorable to her and the one rejected by the concurrent finding of the master and the chancellor. We fully considered this theory in our former opinion, and need not undertake to respond to the matters brought forth in the reargument.

The petition points out no matter of fact or law overlooked, but only reargues matters which counsel say were improperly decided. The office of a petition to rehear is to call the attention of the court to matters overlooked, not to those which counsel suppose were improperly decided after full consideration. Louisville & N. Railroad Co. v. United States Fidelity & Guaranty Co., 125 Tenn. 658, 691, 148 S. W. 671, 680; Badger v. Boyd, 16 Tenn. App. 629, 645, 65 S. W. (2d) 601; see 167 Tenn. 702; Melody v. Hamblin, 21 Tenn. App. 687, 705, 115 S. W. (2d) 237, 248; Fortune v. McGinn et al., 24 Tenn. App. 36, 139 S. W. (2d) 256; Myrick v. Johnson, 25 Tenn. App. 483, 489, 160 S. W. (2d) 185, 189.

The petition is denied at petitioner's cost.

Howell and Hickerson, JJ., concur.