BURGE ICE MACHINE COMPANY *v.* JOHN P. STROTHER, d/b/a, etc.

(*Knoxville,* September Term, 1954.)

Opinion filed November 16, 1954.

Opinion on Petition to Rehear December 16, 1954.

DeVAULT, JOHNSTON & VENABLE and ELY & ELY, all of Knoxville, for appellant.

DONALDSON, MONTGOMERY & KENNERLY, of Knoxville, for appellee.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

We granted certiorari in this case on the petition of both parties to the suit. The case has been ably stated by the Court of Appeals and we copy from same as follows:

"This suit grows out of a contract to furnish and install in 'a neat and workmanlike manner' certain refrigerating machinery and apparatus. The Burge Ice Machine Co., of Chicago, is engaged in the sale and installation of such machinery. For the sake of brevity it is hereinafter referred to as 'Burge.' John P. Strother, a resident of Knox County, Tenn., desired to build and equip a frozen food locker plant, and he is hereinafter referred to as 'Strother.'

"On Nov. 20th, 1945, Strother wrote Burge advising of his being in the market for such equipment, submitting a floor plan of his building then under construction, and asking for prompt action. He specifically stated that he desired to buy a Baker compressor.

"This led to Burge submitting to Strother a proposal to furnish and install this refrigerating machinery for the sum of $4,200, of which $1,400 was to be paid with order, $1,400 upon delivery of equipment, and $1,400 upon completion of the installation and a one-day operation test. This proposal was dated Jan. 8, 1946, and was made by Wm. J. McCoy, Jr., district manager of Burge. It was accepted the same day by Strother, and approved by Burge on January 17th following.

"Strother completed the construction of his plant in March 1946, and was anxious to get the refrigeration installed by May so that he could handle the strawberry crop. He testified that McCoy, district manager of

Burge, told him that Burge had this equipment and material on hand and would have the plant in operation by May 1st, following. The proposal before mentioned did not fix any date for the completion of the work. However, the installation was not completed until the fall of 1946, and this was only partial in that there was not furnished a new 'Baker Ammonia Compressor, Model F6B' as stipulated in the proposal, but in lieu thereof there was installed an old 'loaner' compressor to be used until a new one could be obtained. Compressors are the very heart of refrigerating systems and this 'loaner' never gave satisfactory performance. The delay in installation of the equipment and the installation of this 'loaner' compressor was to be the cause of many complaints from Strother to Burge's representative, McCoy. Strother testified this equipment was never accepted by him.

"Matters continued in this condition until September 28, 1948, when Burge claimed there was due from Strother the sum of $3,114.88, representing the balance due on the original contract plus some lockers subsequently purchased by Strother, and less some questioned items. And on that date Strother executed to Burge a chattel mortgage on this equipment to Burge calling for the payment of $1,000 on Oct. 1, 1948, and securing a series of twelve notes, each for $176.24, with interest, the first of which was due January 1, 1949, and one each month thereafter, making the amount agreed upon $3,114.88.

"It is interesting to note that this mortgage covered one 'Baker Model F6B, 4 cylinder assmonia compressor to be installed on payment of $1,000 cash Oct. 1, 1948.' So it will be seen that this compressor had not been furnished even at that late date, although Burge had sold a similar compressor to another whose order was subsequent to that of Strother. The $1,000 above mentioned

as due Oct. 1, 1948, was not fully paid until February 1949. The new compressor was not delivered and installed until April 1949. In the meantime, in February 1949, Burge tried to pass off on Strother a second hand compressor which had been repainted, but which he declined to accept, telling McCoy 'you either get a new machine in here or let's go to Court.' When this new compressor finally was installed it was in a faulty manner and with some faulty or improper material, (some of which was in the original installation) and was never accepted by Strother, who continually complained to McCoy about it.

"On January 21, 1949, Strother paid all but a few cents of the amount due on the first note, maturing Jan. 1, 1949. Nothing further was paid. Strother refused to accept the installation and Burge would make no further attempt to correct the installation and defects.

"On July 13, 1950, Burge filed this suit to recover on said notes and to enforce the chattel mortgage before mentioned.

"On August 18, 1950, Strother answered, claiming damages largely in excess of Burge's notes, and then filed the answer as a cross bill seeking to recover such damages, which were based upon the defectiveness in, and faulty installation of, the 'loaner' compressor as well as the faulty installation of the new compressor.

"On November 14, 1952 (or twenty-seven months after the filing and service of the cross action) Burge answered, taking the position that the 'loaner' compressor was installed with the approval and to the satisfaction of Strother, and that the failure to more promptly deliver the new compressor was due to the failure of Strother to promptly meet his payments. It recited the attempts made by Burge to satisfy Strother, and says 'that these efforts on the part of the cross-defendant and its agents

were of no avail as the cross-complainant continued to find fault and complained as to both the manner of installation and the compressor itself.'

"A jury was demanded by Strother and after the cause was set for hearing he amended his bill so as to charge:

" 'Defendant avers that the scheme of the complainant of getting defendant to sign notes was a fraudulent scheme of complainant to obtain a stranglehold on defendant, who did not know much about legal procedure, so that after signing the notes defendant would not be able to tell the Court about the many derelictions and bad-faith actions of the complainant before the signing of the notes. Complainant thought that by getting the defendant to sign notes, they could then say to him that his mouth was closed as to everything that took place before the signing of the notes. Defendant avers that this was the chief purpose of complainant in getting him to sign the notes, and that complainant's statement to him that it was just simply a matter of bookkeeping was false and was a fraudulent inducement to get him to sign the notes. At one time defendant took $6,000 in cash in his pocket to complainant's agent and told him he wanted his new compressor which they had contracted to him and that he had $6,000 in his pocket to pay for it.'

"The issues submitted to the jury and its answers thereto are:

" '1. Was there any deception or fraud practiced by the complainant's agent in obtaining the execution of the notes and chattel mortgage by the defendant?

" '(Answer "Yes" or "No") *Yes*

" '2. Was the delay in the delivery and installation of the *old* compressor the fault of complainant, Burge Ice Machine Company, or the fault of defendant Strother?

" 'Burge Ice Machine Co.

" '3. Was the delay in delivery and installation of the *new* compressor the fault of Burge Ice Machine Company or the fault of Strother?

" 'Burge Ice Machine Co.

" '4. Did Strother suffer damage by reason of the delay in the delivery and installation of the *old* compressor?

" ' (Answer "Yes" or "No") *Yes*

" '5. If you answered No. 4 "Yes", how much damage did Strother suffer on account of the delay in the delivery and installation of the *old* compressor?

" '$14,000.

" '6. Did Strother suffer damage by reason of the delay of delivery and installation of the *new* compressor?

" ' (Answer "Yes" or "No") *Yes*

" '7. If you answer the inquiry above "Yes", how much damage did Strother suffer by reason of the delay in delivery and installation of the *new* compressor?

" '$2,000.

" '8. Did Burge install the old compressor properly?

" ' (Answer "Yes" or "No") *No*

" '9. If you answer No. 8 "No", how much would it have cost to install it properly?

" 'Answer: $200.

" '10. Did Burge install the new compressor properly?

" ' (Answer "Yes" or "No") *No*

" '11. If you answer No. 10 "No", how much would it have cost to have made all of the necessary alterations after the installation of the new compressor and to have furnished all the parts, supplies, labor, etc., necessarily incident thereto, so as to have put the plant in the condition it would have been in had Burge complied with its contract?

" 'Answer: $1,500.'

"(Burge unsuccessfully moved to withdraw the issues from the jury and for a decree for the amount of the notes with interest and attorneys fees.)

"Thereupon a decree was entered awarding Strother damages in the sum of $17,500, it being said that item 9 ($200) was 'merely a fact finding and not a damage item,' and from this $17,500 was deducted the principal and interest of Strother's notes, $2,178.12, leaving net damage to Strother in the sum of $15,321.88, for which recovery was awarded.

"Burge moved for a new trial, which was overruled, resulting in this appeal. There are 21 assignments of error.

"Voluminous briefs have been filed pro and con and the case ably argued before us. In order to keep this opinion within reasonable bounds, we shall take up what we consider to be determinative issues which control the subordinate and incidental contentions. In so doing we shall remember that the findings of a jury in Chancery, when approved by the Chancellor, have the same effect as a jury verdict in a suit at law. Code Sec. 10579 reads:

" 'The trial shall be conducted like other jury trials at law, the finding of the jury having the same force and effect, and the court having the same power and control over the finding, as on such trials at law.'

"The first thing we desire to take up is the allowance of $14,000 to Strother as damages incident to the installation of the old or 'loaner' compressor. There was material evidence that it was deficient and also was improperly installed. And there is material evidence that it was never accepted by Strother. He made many complaints, or, as stated by Burge's principal witness, Mc-

Coy, 'About all we have had has been complaints from the beginning.'

"This allowance of $14,000 was based upon Strother's estimate of anticipated profits in a new business for that part of the year 1946 from May 1st (target date of installation) until the machinery was installed. It seems to us that this is nothing but sheer speculation and conjecture.

"Then, too, it will be remembered that on September 28, 1948, Strother executed the chattel mortgage and notes by which he promised to pay Burge the amount due, $3,114.88. This of course was on condition that Burge furnish and install the new compressor and remedy certain defects in the installation, which in turn was based upon condition that Strother pay Burge $1,000 on October 1, 1948. Neither promptly lived up to their undertaking as heretofore set out, and each waived the default on the part of the other. It is incredible that a debtor having a valid cross claim many times in excess of his debt would do as Strother did in the execution of this mortgage and the notes. But, it is argued under the amendment to the bill before quoted there was material evidence showing these papers were obtained by fraud. Strother testified the fraud consisted in this: McCoy came to him and said, "The boss needs some collateral, something to do business on, short of money, and got a lot of equipment. If you sign these notes with me, he has some he can trade in with Baker and get this stuff in.' To which Strother replied: 'I don't know what all these notes are. I am trading man to man to get this job in and take this old galvanized pipe out and get a purge valve on, and get a liquid trap in, and get fixed up like it should be, and I sure will.' McCoy then said: 'You sign these notes for me and we will go along.' Strother testified

further he didn't read the notes, viz., 'I didn't know what was on those notes. I signed purely for that man (McCoy).'

"We attach no probative value to his statement that he did not read the notes or know what was in them. He was experienced in business, was quick and alert in his mental processes, had experienced some litigation, and certainly demonstrated his capacity to obtain able counsel. 'In the absence of fraud or deceit, the rule is the same for those who can and those who cannot read, and the basis of the rule is one of estoppel, the test being negligence and indifference, and not illiteracy or incapacity.' *Richardson* v. *McGee*, 193 Tenn. 500, 246 S. W. 2d 572, citing *DeFord* v. *National Life & Acc. Ins. Co.*, 182 Tenn. 255, 185 S. W. 2d 617, and cases therein discussed. Consequently, we are constrained to hold there was no evidence to support the finding of the jury that fraud was perpetrated upon him in obtention of the notes and chattel mortgage in question. We think this act of his constituted a settlement and relinquishment of all claims for damages except those incident to the faulty installation of this plant, some of which are specifically stated in the above quotation and included in the general phrase 'get fixed up like it should be.'

"At the time the mortgage and notes were taken, both of the parties were in default as to certain of their obligations. Strother had not made the payments stipulated; Burge had not delivered the new Baker compressor within a reasonable time. Each blames the other for the default. But when these notes were executed this constituted a waiver or relinquishment by each of these contracting parties as to all rights previously existing, so that their rights and liabilities then were controlled by the new agreement. We do not think it matters whether

this be based upon estoppel *in pais,* or whether it be termed estoppel by waiver. In *Baird v. Fidelity-Phenix Fire Ins. Co.,* 178 Tenn. 653, at page 663, 162 S. W. 2d 384, at page 388, 140 A.L.R. 1226, there is quoted this statement from *Shaw* v. *Spencer,* 100 Mass. 382, at page 395, 97 Am. Dec., 107, 1 Am. Rep., 115:

"'A waiver is an intentional relinquishment of a known right. An estoppel * * * can be maintained only on the ground that, by the fault of one party, another has been induced * * * to change his position for the worse, in such a manner that it would operate as a virtual fraud upon him to allow the party by whom he has been misled to assert the right in controversy.'

"Neither of these forms of estoppel is pleaded *eo nomine,* but the pleadings show the transaction between the parties. This is sufficient. *Boone* v. *Citizens Bank & Trust Co.,* 154 Tenn. 241, 290 S. W. 39, 50 A.L.R. 1369; *State ex rel. Revenue Agent* v. *Patterson,* 155 Tenn. 169, 290 S. W. 973; *Chandler* v. *Roddy,* 163 Tenn. 338, 43 S. W.2d 397."

The Court of Appeals was of the opinion that even if this claim for anticipated profits had not been abandoned there could be no recovery therefor because it was a new business and therefore, the profits were too remote, speculative and uncertain to sustain a judgment, citing 25 C. J. S., Damages, Section 42b, pp. 518, 519; 15 Am. Jur., Damages, Sec. 157, pp. 573-574; *Donnelly* v. *Jackson Bros.,* 2 Tenn. Civ. App., 408; *Summers & Lewis* v. *Sanderson,* 7 Tenn. App. 624, 628; *Chisholm & Moore Mfg. Co.* v. *United States Canopy Co.,* 111 Tenn. 202, 77 S. W. 1062; *Black* v. *Love & Amos Coal Co.,* 30 Tenn. App. 377, 206 S. W. (2d) 432.

That Court then held that there was no evidence to sustain the allowance of $2,000 damages for the delay in delivery and installation of the new compressor.

That Court upheld the allowance of $1,500 to Strother for the failure of Burge to properly install the new compressor.

The Court of Appeals further held as follows:

"Counsel for Burge argues that the rights of the parties are controlled by section 7242 of the Code (Uniform Sales Act) as construed in *Wildman Mfg. Co.* v. *Davenport Hosiery Mills*, 147 Tenn. 551, 249 S. W. 984, to the effect that after the acceptance of goods the buyer must advise the seller that he is looking to him for damages for the alleged breach. That has no application to this case. Burge was not only to sell but was to *install* this equipment. There—was no *acceptance* by Strother; to the contrary, he insisted all throughout that Burge had not fulfilled its agreement. Had he accepted the installation then of course that would have been another question.

"What we have said eliminates a complaint made by Burge to the effect that Chancellor Dawson filed a finding of fact which included a letter written by Strother to Burge's attorney but which, altho referred to in the trial, was not formally introduced in evidence. The facts are: While counsel was arguing his motion for the Chancellor to take the issues from the jury, he insisted there had been no notice given under the applicable section of the Code (7242) and that the nearest thing to it was the letter of Strother to Burge's attorney on August 9th, 1949, and the letter was read to the Chancellor. Counsel for Strother insisted that if notice was necessary this letter complied with the statute; that notice to the attorney was notice to Burge. This motion was without

the presence of the jury. This letter, altho not included in the bill of exceptions, was embraced in the Chancellor's finding of facts. Whether or not he acted properly in doing so has become moot in view of our holding that no notice was required, in that there had been no acceptance.

"Nor did this make the bill of exceptions incomplete as insisted by Strother.

"Burge complains of the fact that one of the jurors who knew, or claimed to know, much about mechanical refrigeration, took up much time in asking questions about technical matters to various witnesses. It may be that he knew more than counsel in this field. So far as we can tell he seemed to have an air of objectivity, although in the main, the answers he elicited were more damaging to Burge than to Strother.

"No objection was made to this testimony—although a motion for a mistrial was made at one time—and while we appreciate the dilemma in which this placed counsel for Burge, we cannot find that this was prejudicial, especially as we will have so drastically cut down the judgment rendered.

"Complaints are also made as to the Chancellor's ruling on evidence, his refusal of special requests, etc. Most of these assignments do not comply with the rule of this Court by citations of the record, etc., but all present more or less immaterial matters which would not affect the result of the trial.

"We think the rights and equities of the parties will be protected by allowing Burge a recovery for the principal and interest due on the notes in suit, less a credit of $1,500 as of Aug. 18, 1950, the date Strother filed his cross bill. No attorney fees are allowed on these notes, which provide for 'reasonable attorney's fees,' but there is no evidence in the record as to what would be reason-

able. *Nu-Way Ice Cream Mach. Co.* v. *Pig'n Whistle,* 16 Tenn. App. 581, 65 S. W. 2d 575; 11 C. J. S., Bills and Notes, § 653, p. 47.

"Two-thirds of all cost here and below against Strother, one-third against Burge."

Strother has three assignments of error to this Court.

The first is that the Court of Appeals erred in reversing and modifying the decree of the Chancellor and in reducing the recovery in this case to mere damages for the negligent installation of the machinery and in taxing Strother with part of the cost of the cause. It is said that this is error because there was a jury verdict in favor of Strother which was supported by material evidence.

The second is that the Court of Appeals was in error in holding that as a matter of law Strother was not entitled to recover his damages for the simple reason that his business was a new business; that there is no prohibition in law or in equity or in morals against anyone receiving full damages even though he may be starting on his first adventure into business, provided he can prove his damages clearly and the amount thereof with reasonable certainty.

Third, that the Court of Appeals erred in failing to sustain Strother's motion to strike the bill of exceptions and to affirm the Chancellor for the reason that the evidence affirmatively shows that the bill of exceptions does not contain all of the evidence introduced and the proceedings had on the trial of the case.

The other party, Burge, has two assignments of error; the first of which is the allowance of the $1,500 damages for failure to properly install the new compressor because it is insisted that Strother failed to notify Burge that he was claiming damages prior to the filing of his

cross-bill as required by Code Sec. 7242, and secondly, that the Court was in error in decreeing that said Code section did not apply since there had been no acceptance by Strother; it is insisted that this holding is contrary to the testimony of Strother, himself, and to the provisions of the contract.

From a consideration of the entire record and the briefs, we have reached the following conclusions:

We are of opinion that there is evidence to sustain the finding of the jury that Strother was fraudulently induced to execute the notes and chattel mortgage on September 28, 1948. The entire course of dealing on the part of Burge, along with the allegations made in Burge's pleadings to the effect that all of the delay was the fault of Strother's failure to pay as originally promised, coupled with the very pertinent fact that when these notes and mortgages were obtained from Strother, Burge was and had been in default from the beginning in that the Baker compressor had not been furnished and in fact was not furnished until April 1949, and was in default in the manner of such installation as it did make. We think the jury was warranted in finding that these notes and mortgage were obtained for the purpose of closing Strother's mouth as to past complaints and with no present intention of installing the new Baker compressor, as originally contracted for, or of making any other corrections in the installation until Burge had gotten Strother in a position where he could only pay the debt without advancing any claim for damages.

That being true the verdict of the jury on that issue is sustained and the holding of the Court of Appeals that Strother waived his claim for damages for delay, is reversed.

■ We agree with the opinion of the Court of Appeals that the proof as to loss of profits was speculative. We do not interpret the opinion of the Court of Appeals as holding merely that loss of profits cannot be shown merely because it is a new business. The difficulty confronting Strother in this case is that while with reference to the strawberry crop in 1946, he proved that he had made contracts with growers to purchase their berries, yet he had no contracts with buyers for taking the strawberries off his hands after he had processed them. He simply said that he could have sold every one of them at a stated profit. Likewise, with reference to the meat, his testimony is that he could have obtained all the meat that he wanted and that there was a ready market for it among many resturant operators and others whom he offered to name who could not get meat at that time from their regular suppliers and who would have purchased from him. This same thing is true with reference to the turkey business.

Since his business was new and in view of the above recited evidence, it seems clear that such evidence was purely speculative.

*Hagan* v. *Nashville Trust Co.,* 124 Tenn. 93, 136 S. W. 993, depends upon the fact that Hagan, although he was new so far as this contract was concerned, the contract provided that he was to receive a commission on all lots that were sold during the five years, *regardless of who made the sales,* and although the suit was filed before the end of the five years, the proof was not taken until after the expiration of same so that the proof of the amount of sales on which he was entitled to commission was definite and certain.

The distinction appears on page 103 of 124 Tenn.,

near the bottom, on page 996 of 136 S. W., where the Court said:

"So the element of uncertainty that would enter into a suit brought by him for damages for wrongful discharge, had he only been promised the exclusive right to make these sales and commissions on such sales made by him, is entirely removed by this contract."

In *Chisholm & Moore Mfg. Co.* v. *United States Canopy Co.*, supra, the business was new but just as in the case of *Memphis Casting Works* v. *Bearings & Transmissions Co.*, 35 Tenn. App. 164, 243 S. W. (2d) 145, the damages were made certain by the fact that the plaintiff had made a contract on both ends, that is, he had made a contract with the manufacturer and had made contracts with retailers for the sale of the finished product, that is, for the sale of mosquito bar frames in the Chisholm case and for the lawn mowers in the other case.

In *Donnelly* v. *Jackson Bros.*, supra, the only recovery allowed was the past provable profits consisting of the loss of rental of one of the rooms of a building, the extra cost of hauling goods to and from the siding of the Mc-Cains and the diminished value of the sale or rental value of the lot.

In *Brandtjin & Kluge, Inc.*, v. *Pope*, 28 Tenn. App. 679, 192 S. W. (2d) 496, a printing press which had been sold on conditional sale contract to Pope was wrongfully replevied for alleged default in payment of the purchase price. The jury assessed the damages of $225. This amount was well within the proof offered by Pope, which was not speculative. He testified that during the time he had the press his net earnings were $15.78 a day, but that after the press was replevied his net earnings were only $6.42 a day, that is, the difference in his net earnings

was $9.36 a day. It is to be observed also that Pope actually operated the press before it was taken from him and then afterwards so that he was dealing with experience or facts and not with speculation, because he testified from his records.

In any event, in the instant case, Strother would not be entitled to recover for damages for loss of profits on anything but the strawberries because the proof is clear that that was the only thing that was in contemplation of the parties to the contract and it is a one-season crop. His testimony is that he informed Burge's agent only of the fact that he wanted to have the plant ready for the strawberry crop; nothing was said about meat, or turkeys, or anything else. In this situation the statement of Judge Felts, in *Black* v. *Love & Amos Coal Co.,* supra [30 Tenn. App. 377, 206 S. W. (2d) 435], becomes pertinent:

"The question whether expected profits are recoverable as damages for breach of contract has been a controversial one in the law. The earlier tendency was generally to regard such profits as remote or as speculative or as not a part of the contract. *Hagan* v. *Nashville Trust Co.,* 124 Tenn. 93, 98-100, 136 S. W. 993. But the modern view is that such profits may be recovered where they were part of the contract— where an engagement to pay them can be found in the terms of the contract or implied from the circumstances in the light of which it was made—and where they are not in fact remote or speculative but are proved to a reasonable certainty. *Hagan* v. *Nashville Trust Co.,* supra; *Chisholm & Moore Mfg. Co.* v. *United States Canopy Co.,* supra; 5 Williston on Contracts, Rev. Ed., secs. 1345-1346A; Rest., Con-

tracts, sec. 331; Notes, 17 Minn. L. Rev. 194, 46 Harv. L. Rev., 696.''

See particularly *Hadley* v. *Baxendale,* 9 Ex. 341, the parent case, and the Tennessee cases, all cited in the Chisholm case.

With the exception of the question of fraud, we are in accord with the views expressed by the Court of Appeals, and therefore affirm its action, and costs assessed as was done in the Court of Appeals.

## On Petition to Rehear.

Counsel for John P. Strother has filed a very earnest petition to rehear, the principal point of which is a further argument on the question of whether or not the proof as to damages was speculative and in part also whether certain of the damages sought to be proved were within the contemplation of the parties.

We are unable to modify our views expressed in the original opinion and, therefore, in so far as these matters are concerned we are constrained to overrule the petition to rehear.

With regard to another feature of the case, however, the petition to rehear should be allowed. Having sustained the insistence that the question of fraud in the execution of the notes and chattel mortgage was properly submitted to the jury and the jury having found the issue in favor of Strother, we should have held, and in fact intended so to do but through oversight failed to mention it, that the notes and mortgage should be set aside and held for naught and that the recovery in favor of Burge should have been upon the original debt; also in view of the jury verdict approved by the Chancellor finding that Burge was in default in the performance of its contract,

Burge is not entitled to interest on the original debt; interest as allowed by law as of the date of the decree below is allowed Burge on such balance as a recasting of the figures in accord with this opinion may show to be in favor of Burge.

Petition to rehear denied on the first ground, but granted on the second.