T.C. Memo. 2009-5

UNITED STATES TAX COURT

ESTATE OF EUGENIA F. WILLIAMS, Deceased, FIRST TENNESSEE BANK,
N.A., Executor, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12210-02.               Filed January 6, 2009.

Sheldon Kay, Joseph DePew, and William Merrit for
petitioner.

Martha Weber, Nancy Hale, and James May, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  Eugenia Williams was a wealthy woman who
lived a long life but had no natural heirs.  She decided to leave
almost her entire estate to four charities, with one important
exception.  She bequeathed the stock in a closely held company to

the children and grandchildren of her father's business partner. After she died, there was hardfought litigation in Tennessee state court between the charities (acting through her Estate) and the family of her father's partner. They fought about whether the stock had already been sold, about whether the terms of its sale were unfair, and about whether some members of the family had abused their positions of trust with Williams in numerous and varied ways as she grew older. The case was settled. We must decide whether the settlement supports an additional charitable deduction to the Estate.

## FINDINGS OF FACT

A. Early History

A little more than a century ago the Coca-Cola Corporation had not yet even been organized, but James Patrick Roddy, Sr. thought that bottling Coke would be a profitable enterprise. He needed a partner to sweeten his prospects with capital, so he approached his friend and doctor, David Hitt Williams. Dr. Williams joined the venture, and in 1902 they started the Roddy Manufacturing Company. Roddy Manufacturing was one of the first Coca-Cola bottlers in the country and had an exclusive franchise for eastern Tennessee and a bit of Kentucky. Roddy proved himself an exceptional entrepreneur, and both Roddy Manufacturing and its successor, Roddy Coca Cola Bottling Company (Roddy Coke), became lucrative enterprises.

J.P. Roddy, Sr. and Dr. Williams later expanded their business by founding the Coca-Cola Bottling Company of Johnson City, Tennessee. At trial it was estimated that the David Hitt Williams Trust (the Williams Trust), which held Dr. Williams's stock interests at the time of his death, owned just under 50 percent of Johnson City Coke's Stock.

Although it was Roddy and his family who actually ran Roddy Coke and Johnson City Coke, Roddy and Dr. Williams remained friends until Dr. Williams's death in 1929. Dr. Williams made Roddy the executor of his will and the families remained close, with the Roddy children becoming lifelong friends of Dr. Williams's daughter, Eugenia.

But while Roddy and his family were fruitful and multiplied, the Williamses did not:

## The Roddy and Williams Families



Eugenia was Dr. Williams's only child to survive into adulthood. J.P. Roddy, Sr. had two children, J.P. Jr. and Ellen Kate Roddy. Ellen Kate Roddy had no children, but J.P. Jr. had three: J.P. Roddy III, Mary Ellen Roddy Mitchell, and Thomas Roddy (the Third Generation Roddys). (We include her husband, William Mitchell, in the Third Generation Roddys). The Third Generation Roddys have ten children among them, whom we'll call the Fourth Generation Roddys.

B.   Dispersal of the Stock

The shares of Roddy Coke and Johnson City Coke began to disperse in 1929 with the deaths of both Dr. Williams and J.P. Roddy, Sr.

1.   *J.P. Roddy, Jr.'s stock*. J.P. Roddy, Jr. gave a portion of the stock that he inherited from his father to his own children while he was still alive. Hoping to avoid the problems that can happen when a family's block of shares becomes fragmented over time, the Third Generation Roddys concluded a Stockholder Agreement at the end of 1971 that established a Voting Trust. The key term was their agreement to vote their Roddy Coke and Johnson City Coke stock as a block; and they also agreed that if any Roddy wanted to sell his stock, the other Roddys would be granted rights of first refusal.

On January 30, 1993, J.P. Roddy, Jr. withdrew the shares he still owned from the Voting Trust. In April 1993, the men of the

Third Generation Roddys--J.P. Roddy III, William Jess Mitchell, and Thomas Roddy--signed a Voting Trust Agreement with the Fourth Generation Roddys.  This further consolidated the Third Generation Roddys' control of the companies by expanding the 1971 Voting Trust to capture the Fourth Generation's partial ownership of the stock.  It also added one of them, Joseph Hodges McKenzie Roddy, as a trustee.

2.  *The Ellen Kate Roddy Trust*.  Ellen Kate Roddy, J.P. Jr.'s sister, had no children.  When she died, the shares she inherited from her father were placed in the Ellen Kate Roddy Trust.  The Third Generation Roddys had control over this trust, and it too was a member of the Voting Trust.

3.  *The Williams stock*.  When Dr. Williams died in 1929, his 386 shares of Roddy Coke stock and 10 shares of Johnson City Coke stock became the corpus of the Williams Trust.  Eugenia was the trustee, as well as the beneficiary of the Williams Trust's "income and profits."  The remainder of the Trust was to be divided between the National Geographic Society and J.P. Roddy, Jr.

Wealthy families and successful businesses are rarely left unmarked by litigation; in 1930, Eugenia sued J.P. Roddy, Jr. to determine whether she owned her father's estate outright or subject to the Williams Trust.  <u>Chandler v. Roddy</u>, 43 S.W.2d 397

(Tenn. 1931). The answer was that her father's property, including his stock, would largely remain subject to a trust.

More litigation erupted when Roddy Coke declared a stock dividend. National Geographic claimed the dividend was "corpus" rather than "profits" of the trust. Natl. Geographic Socy v. Williams, 497 S.W.2d 908, 909 (Tenn. Ct. App. 1973). If the dividend was corpus, it would be distributed to National Geographic and the Roddys, but if it was income, Eugenia would get it. Eugenia won that suit, and the Williams Trust distributed additional shares of Roddy Coke stock to her. Added to the stock in the Williams Trust she owned as a trustee, she ended up in control of 1,714 shares.

These suits brought by National Geographic made J.P. Roddy Jr. and Eugenia adversaries in court, but didn't seem to embitter relations between the families at all. Despite the lawsuits, but without a family of her own, Eugenia relied on the Roddy family more deeply as she grew older. Early in 1985, she appointed J.P. Roddy, Jr. to be her attorney-in-fact, granting him broad powers to manage all of her affairs. That appointment was prompted by the possibility that Eugenia might become unable to care for herself as she grew older. As it happened, within three years, she moved to St. Mary's Medical Center in Knoxville, where she lived--by all accounts, well cared for--for the rest of her life. J.P. Roddy Jr. was also becoming quite old and in 1989, Eugenia's

power of attorney was amended to allow William Jess Mitchell to act on Eugenia's behalf if J.P. Roddy, Jr. became incapacitated. This meant that, from 1985 until her death, either J.P. Roddy, Jr. or his son-in-law had the power to control all of Eugenia's affairs, including the disposition of her 1,714 shares of Roddy Coke stock.

Eugenia, it may be remembered, had been the trustee of the Williams Trust since her father's death in 1929. She needed to plan for that Trust and, in 1990, she named J.P. Roddy, Jr. and the Third Generation Roddys as trustees. This meant the Williams Trust would have a trustee, but also meant that the Roddys, in one capacity or another, would control nearly all of Roddy Coke's stock.

In January 1991, the Roddys, acting as trustees of the Williams Trust, agreed with the National Geographic Society to have Roddy Coke redeem the Trust's 386 shares for $1,640,500. Even though Eugenia had an interest in the profits of the Trust and the Roddys and National Geographic held an interest only in the Trust's corpus, Eugenia was not consulted before the redemption. Instead, the Roddys redeemed her shares with William Jess Mitchell acting as her attorney-in-fact. After redemption, the Voting Trust controlled more than 50 percent of the outstanding Roddy Coke stock for the first time.

C.    The Merger

During the early 1990s, Coca-Cola decided to integrate its operations by consolidating control over its franchises.  What happened after Coca-Cola reached into eastern Tennessee to gain control over Roddy Coke and Johnson City Coke is what eventually led to this case.

Coca-Cola was willing to offer nearly $130 million for Roddy Coke, but it did not want to get bogged down in disputes over how to divvy up the money.  And so the transaction became quite complicated.  In February 1990, the Third Generation Roddys and Roddy Coke signed a right-of-first-refusal agreement with Coca-Cola Enterprises.  The Agreement gave Coca-Cola Enterprises a right of first refusal over any Roddy Coke stock that members of the Third Generation Roddys wanted to sell, with certain exceptions for intrafamily transfers.  The Agreement also specified the price Coca-Cola Enterprises would pay for any shares of the bottling companies that fell into the control of the Third Generation.

The Roddys' foresight in creating the Voting Trust was proved.  Rather than a straight cash-for-shares deal, Coca-Cola Enterprises paid the parties to the Voting Trust a control premium of $24,500,000 for their majority ownership of Roddy Coke.  And Coca-Cola Enterprises also paid the Roddys who managed the bottlers $8,700,000 as a special premium in the form of a noncompetition agreement.

Left outside this flurry of dealmaking were the shares held by J.P. Roddy Jr. and Eugenia. The Roddy witnesses testified credibly that the family did not want to have J.P. Roddy, Jr.'s low-basis stock sold for a considerable capital gain, only to have the proceeds taxed again as part of his estate when he died.

They also testified that, from their perspective, Eugenia was in a similar situation. She too was old, and she too would be taxed on an enormous capital gain if she just sold her shares into the merger. But we find her position to have been different. As the Roddys knew, she had no obvious heirs; and her will, as they also knew, left her estate to charity--except for the Roddy Coke stock. So, if the Roddys sold her stock, all of the proceeds would end up being taxed away as capital gains or given away to charity. If the stock could somehow be kept in her name, none of its accumulated value would be taxed away as capital gains, and the stock would go to the Roddys under the terms of her will. Under the Roddys' agreement with Coca-Cola Enterprises, that stock would then be sold at a set price. The Roddys would have to pay any tax on the capital gains (reduced by the step-up in basis), and the Estate would have to pay any tax on the stock's value at the time of Eugenia's death. But at least the money would not all go to charity.

The Roddys' solution to these problems was put in place in April 1993. Coca-Cola Enterprises and a subsidiary that it had

created to acquire the Roddy Coke stock agreed with William Jess Mitchell (acting under his power of attorney for Eugenia) to a "Right of First Refusal Agreement" with Coca-Cola Enterprises. This Agreement barred J.P. Roddy, Jr. and Eugenia from transferring their Roddy Coke stock--other than by will--without the consent of Coca-Cola Enterprises. It set no purchase price at which Coca-Cola would buy the shares. It allowed for transfers of Roddy Coke stock to Roddys who had signed the Right of First Refusal Agreement with Coca-Cola Enterprises or were parties to related agreements with Coca-Cola Enterprises or its affiliates. And it required Eugenia's shares themselves to bear a legend noting that the shares were from that time on subject to these restrictions. But the Agreement was not a gratuitous transfer: Coca-Cola Enterprises agreed to pay both Eugenia and J.P. Roddy, Jr. four percent of the value of their stock holdings each year. Between 1993 and Eugenia's death, these payments totaled nearly $6 million, and implicitly valued her stock at about $30 million.

On the same day that it signed this Right of First Refusal Agreement with the elderly Roddy Coke stockholders, Coca-Cola Enterprises and its acquisition subsidiary signed a Conditional Agreement with the Third and Fourth Generation Roddys. This Conditional Agreement included a promise by those Roddys that, if any of them acquired Roddy Coke stock, they would "immediately" sell it to Coca-Cola Enterprises at a price per share that was

equal to what Coke had been willing to pay in its initial offer, but with a yearly increase of 1.5 percent in purchase price and 5.5 percent for interest.  The effect was to give both J.P. Roddy, Jr. and Eugenia an income stream for the rest of their lives, Coca-Cola Enterprises the right to buy that stock when either of them died, and the Roddys who stood to inherit that stock a higher sale price when they finally received and sold the stock.

On April 21, 1993, the transaction between Roddy Coke and Coca-Cola Enterprises closed.  Under the merger agreement, Roddy Coke remained in existence as a corporate subsidiary of Coca-Cola Enterprises.  In that capacity it began to pay management fees to its new parent for risk management, tax management, information technology, and other similar services.[1]

D.   Eugenia's Will and the Estate Distribution

Eugenia Williams never changed her will after the merger. She died on February 26, 1998 and bequeathed all of her property except the bottling-company stock to several charities.  These included bequests of $10,000 to the Old Gray Cemetery of

---

[1]  What happened to the Johnson City stock is somewhat un-clear from the record.  It seems, however, that nearly half of the Johnson City shares were in the Williams Trust with the rest subject to the Roddy family's Voting Trust, and that the stock found its way to Coca-Cola Enterprises in a parallel deal, albeit with much lower numbers.  In any event, the Johnson City stock, because it was entirely subject to a trust in which Eugenia had no residuary interest, never found its way to her estate.  It doesn't affect the outcome of this case.

Knoxville, more than $6 million to the University of Tennessee, and the residue in equal shares to four Tennessee institutions: St. Mary's Memorial Hospital, the Printing House For the Blind, Vanderbilt University, and the East Tennessee Children's Hospital (collectively, the Charities).

Eugenia had named First Tennessee Bank as her executor, but as early as October 1998 the Charities began to suspect that the Roddys' handling of Eugenia's financial affairs had prevented them from receiving a larger share of her estate. Fearful of litigation, the Bank was hesitant to distribute the stock to the Roddys. This meant that the Roddys could not take possession of the stock, and could not sell it under the Conditional Agreement to Coca-Cola Enterprises.

The Roddys and First Tennessee Bank began moving toward a solution by executing an Estate Distribution Agreement. Under this Agreement, the stock was put in a Restricted Fund. The Roddys were allowed to withdraw the stock to sell it to Coca-Cola Enterprises, but with the proceeds going into the Restricted Fund. The Roddys could then withdraw some cash from the Fund, as long as the Fund's value did not drop below a minimum amount. This Fund was to be the sole property of the Fourth Generation Roddys, because the Third Generation Roddys had all disclaimed any interest in Eugenia's stock they might inherit.

After receiving the Fund, the Fourth Generation Roddys entered into a Tenants in Common Agreement. Under this Agreement, they paid to the Bank as executor the amount of the estate taxes attributable to the Roddy Coke stock. Each of the Roddy beneficiaries also kept an interest in the Restricted Fund equal to his allocable share of the Roddy Coke stock. Other requirements under the Tenants in Common Agreement were that the Roddys were each responsible for paying the income taxes attributable to their portions of the Fund and that each Roddy's allocable portion was alienable.

With these Agreements in place, the Bank distributed Eugenia's stock, and the Roddys sold the stock to Coca-Cola Enterprises for about $33 million. None of these proceeds were returned to the Estate; the Roddys did put $20 million of the proceeds into the Restricted Fund. The Bank then filed the Estate's Form 706, valuing the 1,714 shares of Roddy Coke at $14,052,638.

This meant that, whether through inheritance or via the agreements they had signed years earlier with Coca-Cola Enterprises, the Roddys had received the entire value of the Roddy Coke stock. The stock was thus not considered part of the residuary proceeds of Eugenia's estate. This resulted in each of the four charities' receiving a mere $6,695,774, much less than each would have received if Eugenia had just sold her stock back in 1993 and held on to what would have been left after taxes.

E.   <u>The Charities Sue</u>

One could predict litigation.  From the Charities' perspective, what the Roddys did to Eugenia--from the redemption of the Williams Trust stock (giving their Voting Trust majority control of Roddy Coke) to the payment to the Roddys of a control premium to the Right of First Refusal Agreement that stripped Eugenia of the power to sell her stock to anyone but Coca-Cola Enterprises-- all looked like a massive violation of the various duties that various Roddys owed Eugenia, all aimed at getting as much of the Roddy Coke stock's value for themselves.  From the Roddys' perspective, that's more or less correct--but with the very large reservation that they didn't think they were violating any duties they owed her.  Instead, they were fulfilling what they saw as her desire that the Roddy family--not the IRS and not the Charities--realize the ultimate value of nearly a century's worth of work that their families had put into Roddy Coke when she died.

The Charities prepared for war.  They wanted the much greater profit from the actual sale of the stock, rather than what was left of the payments which Eugenia had received under the Right of First Refusal Agreement.  They demanded that the Bank, as executor of the Estate, sue on their behalf.  An administratrix *ad litem*, Anna Hinds, was appointed.  She then sued William Jess Mitchell and the Roddys, demanding that all

proceeds from the sale of Eugenia's stock be given to the Charities.

The original suit listed several causes of action; an amended complaint added another for constructive sale.

| Defendant | Cause of Action | Result |
|---|---|---|
| William Jess Mitchell | Breach of duty as attorney-in-fact for Eugenia F. Williams | Resolved by the settlement |
| J.P. Roddy, III<br>Mary Ellen Roddy Mitchell<br>Thomas Roddy | Breach of duty as co-trustees of the David Hitt Williams Trust | Chancery Court ruled for the Roddys |
| William Jess Mitchell<br>J.P. Roddy, III<br>Mary Ellen Roddy Mitchell<br>Thomas Roddy | Constructive fraud as Eugenia F. Williams' attorney-in-fact and as trustees | Resolved by the settlement |
| | Breach of duties as majority shareholders | |
| | Civil conspiracy | |
| | Fraudulent concealment and non-disclosure | |
| | Conspiracy to conceal and non-disclosure | |
| | Intentional interference with inheritance | |
| | Conversion | |

| | Intentional interference with inheritance (this is the only action in which the Charities themselves were plaintiffs) | Dismissed by Chancery Court |
|---|---|---|
| William Jess Mitchell J.P. Roddy, III Mary Ellen Roddy Mitchell Thomas Roddy First Tennessee Bank The Fourth Generation Roddys (added to impose a constructive trust) | Constructive sale | Added by an amended complaint, then resolved by the settlement. |

The Estate argued that the stock had been constructively sold before Eugenia's death because, if the stock had been sold before her death, the proceeds would have become a part of Eugenia's residuary Estate, much to the Charities' advantage. The administratrix *ad litem* even moved for partial summary judgment using this theory. The parties argued fervently over the motion's merits, but then settled before the Chancery Court ruled. The settlement left the Charities with $20 million, all payable from the Restricted Fund set up under the Estate Distribution Agreement that the Roddy beneficiaries had negotiated with the Executor. Although all the defendants named in the various causes of action received the benefit of the settlement, the settlement money came only from the Restricted Fund.

F.    The Notice of Deficiency

While the state-court suit was being fought, the Commissioner began looking at the Estate's tax return, and in April 2002 he sent a notice of deficiency, determining that the Estate owed $596,086.  The primary source of the alleged deficiency was an understatement of $927,999 in the value of the Roddy Coke stock.  After litigation got underway, the Commissioner actually conceded this issue--the parties now agree on a value of $12 million for that stock--but the Estate began a counteroffensive by claiming a refund under section 6512(b)(1)[2] of the lesser amount of the value of the shares or the settlement proceeds distributed to the Charities.  The Estate's claim arises from the undisputed fact that the Charities got more than the roughly $6 million each that the Estate reported on the Form 706.  The Estate argues that this additional money is nothing more than a share of the sale price of Eugenia's stock to Coca-Cola Enterprises.  The Commissioner argues that any extra money that the Charities got is attributable not to the shares, but to the settlement of the state-court litigation.  He argues that any increase in the charitable deduction merely matches the value--which the Estate left off its return--of that litigation.

---

[2] All section references are to the Internal Revenue Code, and the Rule reference is to the Tax Court Rules of Practice and Procedure.

The Commissioner also moved to amend his answer before trial. In his proposed amendment, the Commissioner specifically denied that the Estate was entitled to any deduction based on the distribution of the Hinds v. Mitchell settlement proceeds, and alleged that the value of that litigation may have exceeded the amount of settlement. He asserted a revised deficiency of $11,659,891.

The Commissioner later retreated, and agreed that he was not seeking to impose an additional tax liability on the Estate based on the value of the litigation asset, but only arguing that the Estate was not entitled to an overpayment refund because any increased charitable deduction would be neutralized by an increase in the value of the gross estate. The Commissioner is arguing, in other words, that the cause of action the Estate had against the Roddys is not the same thing as the shares of stock that--however encumbered by side agreements--Eugenia still owned on the day she died. We granted the Commissioner's motion to amend his answer, but only as a clarification of his position that the settlement proceeds did not give rise to an increase in the Estate's charitable deduction.

Trial was held in Knoxville, where Eugenia died and the Executor has its principal place of business.

OPINION

We begin by noting how curious the Estate's argument must look to a nonlawyer:  Its own return listed the stock as a taxable asset that was to be distributed to the Roddys.  Eugenia's name was (at least metaphorically--there's no indication the stock was held in street name and it wouldn't matter if it was) on the shares.  And when the Executor distributed the shares to the Roddys, they sold them to Coca-Cola Enterprises--what could they possibly be selling other than shares of stock?

So how can the Estate possibly argue that the settlement proceeds are somehow legally the same thing as those shares of stock?

The Estate's argument might appear to be either nearly frivolous or remarkably subtle.  Its essential point is nonintuitive--an assertion that the Roddys had effectively sold the stock before they actually received it--and that, appearances to the contrary, Eugenia did not, as a matter of law, own the stock when she died.

To decide whether this argument is nothing more than fizz requires us to begin with a brief explanation of how courts analyze the taxability of proceeds from settlements of litigation. This is a venerable problem--dating back at least to Lyeth v. Hoey, 305 U.S. 188, 196 (1938)--and the general rule may be simply stated:  If the proceeds of a settlement represent something

that would have been taxable, such as lost wages, then they are taxable.  Id.  However, if the proceeds of a settlement represent something that is not taxable, such as a personal-injury award, the proceeds are not taxable.  Id.

The Estate's position becomes more plausible if one approaches it through some simple hypotheticals.  Imagine someone who owns only a pearl of great price, which she intends to leave to charity when she dies.  Imagine that she dies, and the charity gets the pearl.  It can sell the pearl or keep it--and if it sells the pearl, it keeps the proceeds.

Now imagine that our hypothetical decedent wills the pearl to two charities.  It's most likely that the executor would sell the pearl and divide the proceeds between the two charities.  With the step-up in basis at death (and, since it's a hypothetical, no *post mortem* increase in value), these cash proceeds would be treated by the IRS the same way as the distribution of the pearl itself--no income tax, and the charities get the value of the pearl.

Let's add a complication.  A third party learns of the pearl and, rather than sell all that he has to buy it, steals it instead.  The decedent dies.  Her estate sues the thief for conversion damages or return of the pearl.  How should the estate report this?  Theft doesn't grant good title, but the thief has the pearl.  The answer, we think, is that it doesn't really matter.

The estate could list the pearl as the asset. Then, if the lawsuit against the thief leads to the pearl's return, the estate can distribute the pearl or, if the estate wins damages, can distribute those damages to its hypothetical charitable legatees. Lyeth v. Hoey teaches us to treat any settlement proceeds as if they were what they are substitutes for--in our hypothetical--the pearl. The right to damages would in some sense be the same as the pearl of great price or, at the very least, not an additional asset of the estate.

Add another twist: The thief turns out to be clever. Instead of coming in the night to steal the pearl, he comes in the bright light of day with a cleverly designed paste pearl which he substitutes for the real one. The decedent dies. We can see no reason why the results of the last hypothetical don't again apply: The estate could list the real pearl as an asset, but would really have only a right of action against the thief for damages or return of the pearl. In the end, again, the right to damages would be treated the same as the pearl of great price --not as an additional asset of the estate.

And one last hypothetical: The hypothetical decedent's hypothetical estate doesn't realize at first that all it had was paste, so it lists the pearl on its return as if it were the pearl of great price. If our hypothetical decedent left the pearl not to charities but to friends, the estate might pay tax

on the value of the pearl.  But then the estate realizes that the pearl of great price is missing.  The thief has long since sold it.  The estate would still have only a right of action against the thief for conversion or restitution.  Any damages would again be taxed the same as if the pearl itself were returned.  But if the estate won only money, rather than the return of the pearl, the specific bequest of the pearl would be defeated.[3]

We return to the real world, only to face a complication absent from our hypotheticals--the Roddys, far from being thieves, were the objects of Eugenia's affection.  She wanted them to receive the stock-of-great-price and said so in her will.  But the problem here is that the Roddys may have so encumbered that stock with restrictions and diminished it in value that Eugenia's estate might have been left with something that was--if not a paste pearl--not really the same as the stock Eugenia had before the Roddys' deal with Coca-Cola Enterprises back in 1993.

And that is the Estate's argument here.  It is claiming a refund because it originally paid taxes on the Estate's Roddy Coke stock as if it all went to the Roddys instead of treating it as having been constructively sold years before.

---

[3] The estate-law term for this is "ademption by extinction," defined as the "'doing of some act with regard to the subject-matter which interferes with the operation of the will.'" University of the South v. Klank, 984 S.W.2d 602, 604 (Tenn. 1999) (quoting Am. Trust & Banking Co. v. Balfour, 198 S.W. 70, 71 (Tenn. 1917)).

The Commissioner argues that the stock was never sold till after Eugenia died, and so the settlement proceeds must instead have been proceeds of an asset--the Estate's tort action against the Roddys--that wasn't listed on the original return. If the Commissioner is correct, the settlement proceeds would still be part of the residual estate and still go to the Charities, but because the litigation asset was not listed on the return, it would not have been accounted for in the original estate tax paid and the Estate would not be entitled to a refund now.

The parties battle on two fronts. The first is the effect of the Roddys' Estate Distribution Agreement with the Executor on the characterization of the settlement proceeds. The Commissioner says the terms of that Agreement show that the Roddys had such unfettered control over the stock as to prove that they really owned it. The Estate argues that the Restricted Fund was, well, restricted--and so proves nothing.

The second front is how to interpret the Settlement Agreement itself, together with the negotiations leading to it. And to characterize settlement proceeds for tax purposes:

> we must look to various factors, including the allegations in the State court pleadings, the evidence adduced at trial, a written settlement agreement, and the intent of the payer.

Threlkeld v. Commissioner, 87 T.C. 1294, 1306 (1986), affd. 848 F.2d 81 (6th Cir. 1988).

A.    The Estate Distribution Agreement and Restricted Fund

The Estate Distribution Agreement was a compromise between the Executor and the Roddys.  Both the Commissioner and the Estate agree that the Restricted Fund that the Agreement created was subject to constraints, but it was also a creative solution to another problem:  It was clear that the Estate's tax liability would be due before the resolution of any potential claims the Charities or the Estate had against the Roddys.  A simple distribution of the shares to the Roddys would have left the Bank open to potential liability to the Charities.  But if the Bank completely refused to distribute the shares to the Roddys, it could have been violating its duty to the Roddys as beneficiaries under the will.  And, most importantly in our view, it would have possibly been stripping off much of the value of the shares-- salable as they were at a high price under the Conditional Agreement between the Roddys and Coca-Cola Enterprises.

The testimony of Keith Keisling (an officer of First Tennessee Bank) and Jim Roddy (which we specifically find credible on this point), as well as the Estate Distribution Agreement itself, made clear the parties' intent.  Keisling testified that the Estate Distribution Agreement was a mechanism for the Executor both to ensure that the taxes would be paid and to avoid any liability to the Charities, which were already expressing concerns over the disposition of the stock.  Jim Roddy similarly

testified that the Estate Distribution Agreement was necessary because:

> We needed to pay Estate taxes on this asset that was going to come to us, and we did an agreement with the trustees whereby we would sell the stock into a tenants in common restricted account. In the event that the shares didn't belong to us, we would return it back to the Estate, but at this time, you know, the determination was that the shares would go to us and we would treat it that way.

The Estate Distribution Agreement also contains a provision that the restrictions on the Restricted Fund--and thus the Estate Distribution Agreement itself--would terminate upon the earliest of: the release by the Executor of any claims on the shares' value; the issuance of a final (nonappealable) court order regarding the disposition of the shares; or April 2, 2003. This indicates that the Estate Distribution Agreement was not an outright distribution to the Roddys, but something resembling the *res* in an interpleader. It is as if the parties to a dispute about the ownership of a load of bananas reasonably agree between themselves to sell the fruit before it spoils, and continue their fight over the proceeds. See also, e.g., U.C.C. sec. 2-704(2) (1998).

The Commissioner argues that the Roddys held sufficient control over the Restricted Fund to make it the Roddys' property. Many factors support this argument: The Roddys had discretion--with the Estate's permission as cosigner--to invest the proceeds

in cash or any readily marketable securities, "the sole property of the Roddy Beneficiaries;" the Roddys were allowed to make withdrawals from the Fund to pay taxes related to income from the Fund if the Fund's income exceeded 4 percent; and the Roddys acknowledged in the Agreement that the sale of the stock would result in tax consequences to them. The Commissioner also argues that if the Roddys did own the Restricted Fund, the settlement payment was made from the Roddys' own property, indicating it was actually the settlement of a tort claim. We don't think any of this makes much difference--the Estate's theory is that the Roddys' payment back to the Estate was the equivalent of returning proceeds from the sale of the stock, not additional compensation for other torts committed against Eugenia, and the source of the funds used for the payment makes no difference to that characterization.

The Estate points to the significant restrictions on distributions from the Restricted Fund as evidence that the sale proceeds never actually accrued to the Roddys. The Estate contends that, though meandering, the path the money took led to the same destination it would have reached if Eugenia had sold the stock and the Charities received the money as residuary beneficiaries.

The Estate does highlight one fact about the settlement's having been paid out of the Restricted Fund--because the Third Generation Roddys had disclaimed any interest in the shares, that

payment from the Restricted Fund was a direct loss only to the Fourth Generation Roddys. And the Fourth Generation Roddys did not have the same duties to Eugenia as the Third Generation Roddys.

We therefore find that the Restricted Fund was created as a receptacle for the proceeds of the stock until any legal issues between the Roddys and the Estate could be resolved and the stock or its proceeds could be properly distributed. We hold that its terms do not affect our characterization of the settlement proceeds as either compensation for torts or other wrongs committed by the Roddys, or as restitution for a constructive sale of Eugenia's stock before she died.

B.    Characterization of the Settlement in Hinds v. Mitchell

We next turn to a direct analysis of the settlement proceeds from the state-court litigation. The Estate urges us to begin and end with the language of the Settlement Agreement. That Agreement is quite clear:

> Whereas, Hinds and the Residuary Beneficia-
> ries contend in the Litigation that the spe-
> cific bequest of the [shares] was, as a mat-
> ter of law, adeemed and/or the said shares
> were constructively sold, and thus the
> [shares or their value] actually passed or
> should have passed to the Residuary Benefici-
> aries.

This was the only cause of action specifically named in the Settlement Agreement.

The Commissioner argues that we shouldn't rely on the Agreement's text. He asserts that the Agreement was written in collusion between the Roddys and the Charities once they realized that pinning the settlement proceeds to the constructive-sale theory could lead to a significant refund claim redounding to the benefit of the Charities as residuary legatees and letting them ease up on the Roddys in negotiating the settlement. He argues that the parties in Hinds v. Mitchell had every incentive to tailor their settlement in a manner that would minimize ultimate tax liability and thus maximize their available funds. The Commissioner's strongest argument is to point out that the parties in Hinds v. Mitchell were adverse to each other only as to the state-law causes of action. When it came to the settlement's tax consequences, the parties and their attorneys understood (and we so find) that any funds kept from the IRS would increase the amount they could divide among themselves. This is not a new problem. In Bagley v. Commissioner, 105 T.C. 396, 400-01 (1995), affd. 121 F.3d 393 (8th Cir. 1997), we analyzed a settlement between the two parties to a tort action involving tortious interference with present employment, tortious interference with future employment, libel, and invasion of privacy. Under the settlement, the defendant paid $1.5 million to Bagley, the plaintiff, to settle all claims. Id. at 403. The defendant's interests were minimizing cost, avoiding publicity, eliminating the

risk of punitive damages, retrieving some corporate documents, and obtaining a full release.  We analyzed the problem of allocating damages in that case by placing the facts in <u>Bagley</u> in a range bounded by <u>Robinson v. Commissioner</u>, 102 T.C. 116 (1994), affd. in part and revd. in part 70 F.3d 34 (5th Cir. 1995), and <u>McKay v. Commissioner</u>, 102 T.C. 465 (1994), vacated without published opinion 84 F.3d 433 (5th Cir. 1996).  We began by acknowledging that the allocation of a settlement by the parties is "generally binding for tax purposes to the extent that the agreement is entered into by the parties in an adversarial context at arm's length and in good faith."  <u>Bagley</u>, 105 T.C. at 407.  In <u>Robinson</u>, however, the allocation didn't control because it "was uncontested, non-adversarial, and entirely tax-motivated, and did not accurately reflect the underlying claims."  <u>Id.</u> at 407.  By contrast, in <u>McKay</u> the settlement had been made by "hostile parties who were in an adversarial position with respect to the allocations to be made in the settlement."  <u>Id.</u>

In <u>Bagley</u>, we reasoned the facts were not like those in <u>McKay</u>, where the taxpayer lacked the "freedom to structure the settlement on his own," whereas in <u>Bagley</u> the parties had been "jointly participating in the drafting of the agreement."  <u>Id.</u> at 408.  This led us to conclude that the settlement documents were not controlling.  Yet <u>Bagley</u> was also unlike <u>Robinson</u>, because

totally tax-motivated collusion was missing, too.  The answer was somewhere in between:

> Based on these facts, we conclude that some of the $1.5 million is properly allocable to punitive damages.  However, we do not agree with the amount [the Commissioner] allocated. The parties were negotiating for an amount in lieu of the overall amount petitioner might recover if the case went to trial.  They were considering the risk of trial, as well as items unrelated to the money that petitioner might recover, such as the return of the Bagley documents and the confidentiality of the settlement.

Id. at 410.  We proceeded to list the various factors important to Bagley's former employer, including the avoidance of punitive damages.

We begin here with what the witnesses in the present case said their motivations were.  Doris Allen, an attorney who represented two of the Third Generation Roddys and their families, testified with some credibility that from the Roddys' perspective, the sole ground for settlement was the constructive-sale theory, and they would not have settled on any other theory.  She also credibly testified that she thought at the time that the strongest legal theory in the litigation was the constructive-sale issue.  Jim Roddy, a Fourth Generation Roddy, testified that the only theory the defendants thought might succeed was the constructive-sale theory.

Two attorneys for the Charities also testified, and both credibly confirmed that the constructive-sale theory had been at

least a factor in the settlement.  David Black, who had represen-
ted the American Printing House For the Blind and then the admi-
nistratrix *ad litem*, testified that "the most straightforward"
cause of action for the administratrix to prevail on would have
been the constructive-sale theory.  This was due at least in part
to the lack of a need for any "proof of intent" or "establishment
of bad acts."  Black also testified, however, that litigation
would have been ready to proceed on any of the causes of action
listed in the complaint.  Even as the Commissioner's witness,
Black testified on direct examination that the plaintiffs in the
<u>Hinds</u> case were prepared to go forward on all counts which they
believed viable after discovery.  This would, of course, have
included the constructive-sale theory.

Taking that testimony into account, we find that settling
the constructive-sale theory was the dominant, but not exclusive,
motivation of the Roddys.  This finding is also supported by the
evidence that, at an early point in the administration of the
Estate, both the Executor and the Charities had concerns about
the propriety of the 1993 transactions and their potential to
give rise to *both* constructive-sale and breach-of-fiduciary-duty
causes of action.  Indeed, the Bank was worried enough to seek
legal advice on both these issues and supported the appointment
of an administratix *ad litem* to pursue both.

We also acknowledge the strength of the Commissioner's argument that the constructive-sale and various breach-of-fiduciary-duty causes of action were intertwined. The Third Generation Roddys, and especially William Jess Mitchell, owed a number of duties to Eugenia in various capacities--as her attorney-in-fact, as trustees of the Williams Trust, and as officers and directors of Roddy Coke and Johnson City Coke. And the Estate's original complaint alleged that the Roddys breached these duties in 1993 by securing for themselves the ability to sell both their own and eventually Eugenia's stock to Coca-Cola Enterprises while receiving a control premium--a premium so large that it deprived Eugenia of full value from the deal.

But we must also acknowledge that all those involved thought that the constructive-sale theory suffered from far fewer weaknesses than any of the tort theories. Proposed finding 49 in the Estate's opening brief states that "the executor's attorneys advised [the Charities] that the executor would not prevail in any such litigation [i.e., the tort litigation]," and proposed finding 55 states, "In October and November 1998, the residuary beneficiaries raised concerns to the petitioner's personal representative (executor) involving the bequest of the [Roddy Coke] stock to the Roddy family." While the Commissioner objects to both of these, he does not offer any specific rebuttal, and we find them to be proved.

The most important weakness of the various tort theories was that the Roddys had a plausible argument that the 1993 transactions were fundamentally fair to Eugenia in that the Right of First Refusal payments and the other payments she received constituted an acceptable alternative to paying a large capital-gains tax and seeing what was left of the proceeds go to the Charities. They could point to the similar deal they negotiated with the Roddy patriarch, J.P. Roddy, Sr.

Eugenia was, moreover, never formally judged incompetent. There was credible testimony that the Roddys and their lawyers strongly believed that absent a finding that Eugenia was incompetent, any action based on a breach-of-duty theory would have been subject to a statute-of-limitations defense. Indeed, the Estate's attorneys originally rejected the idea of pursuing the breach claim in part because of this.

We also find on the basis of the credible evidence in the record[4] that the parties thought that trial of the fiduciary-duty causes of action might lead to a judgment that the stock or proceeds from its sale must be disgorged. See <u>Freeman v. Martin</u>, 181 S.W.2d 745, 746 (Tenn. 1944). This means that even the

---

[4] We use phrases like "credible evidence" in discussing state law because our focus in allocating the settlement proceeds is not on what the law is (obviously a legal, not a factual, question), but on what the parties and their lawyers *thought* the law was when agreeing to the settlement.

settlement value of the tort causes of action had a hefty restitutionary component.

And, finally, we note that the economic burden of the settlement fell entirely on the members of the Tenants in Common Agreement--the Fourth Generation Roddys, who were named defendants only in the amended complaint's cause of action for constructive sale. We find this very significant, because it shows that all the damages paid under the Settlement Agreement were being paid by only some of the Roddys, who presumably had an incentive not to bear the costs of the settlement entirely on their own without good reason.

Nevertheless, even the Fourth Generation Roddys were Roddys, and so (if possessed of any filial affection) they would benefit at least intangibly from the releases of their elders in the Third Generation from all the causes of action in which those Roddys were the named defendants. Even J.P. Roddy, Jr.'s estate was released from any liability, and he had had the primary obligations to Eugenia for some of the years involved.

Weighing these various factors is not something we can do with great precision. But persuaded especially by where the economic burden of the settlement lay, and the parties' reasonable estimation of the probabilities of success on the different causes of action, we find that 90 percent of the settlement proceeds is allocable to the constructive-sale theory, with the

remainder allocable to the tort theories (or, more precisely, the damages-other-than-monetary-equivalent-of-the-stock theories). Thus, 90 percent of the settlement proceeds should be considered to be only a return of the value of the stock to the Estate and not compensation for any profits or income to Eugenia.

Petitioner having agreed to a refund of the lesser of this amount or the stipulated value of the shares, and to reflect the parties' various other concessions and stipulations,

<u>Decision will be entered under Rule 155</u>.